N. A. Woodworth Company v. Commissioner.
N. A. Woodworth Co. v. Commissioner
Docket No. 1256.
United States Tax Court
1945 Tax Ct. Memo LEXIS 227; 4 T.C.M. (CCH) 418; T.C.M. (RIA) 45137; April 20, 1945
*227 Ralph W. Barbier, Esq., 1000 Penobscot Bldg., Detroit, Mich., for the petitioner. John H. Pigg, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves income tax, declared value excess profits tax, and excess profits tax for the calendar year 1940, and for the fiscal period from January 1, 1941, to November 30, 1941, as follows: Declared Value
Excess Profits
Excess
Income Tax
Tax
Profits Tax
1940
$ 2,725.69
$189.64
$ 6,772.06
1941
16,574.67
84,203.97 These sums are greater than those stated in the deficiency notice and are based upon respondent's amended answer. Petitioner contends that there was overpayment of income tax in the amount of $356.12, of declared value excess profits tax in the amount of $726.22, and of excess profits tax in the amount of $3,581.72, for the calendar year 1940. The only issues remaining for consideration are the following: (1) What is a reasonable allowance for salary or other compensation for the personal services actually rendered by petitioner's president and general manager, N. A. Woodworth, during the calenmdar year 1940? Petitioner *228 claimed a deduction of $34,671.78 therefor; the Commissioner disallowed $9,671.78 thereof. (2) What is a reasonable allowance for salary or other compensation for the personal services actually rendered by petitioner's president and general manager, N. A. Woodworth, during the fiscal period January 1, 1941, through November 30, 1941? Petitioner claimed a deduction of $143,667.64 therefor; the Commissioner disallowed $110,667.64 thereof. (3) What is a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) of certain machinery and equipment owned by petitioner and used in its business during the calendar year 1940, and during the fiscal period from January 1, 1941, to November 30, 1941? Petitioner claimed the right to depreciate such machinery and equipment at an annual rate of 12 per cent, based on an estimated life of 8 1/3 years; the Commissioner determined upon a rate of depreciation of 6 2/3 per cent, based upon an estimated life of 15 years. Findings of Fact We adopt as part of our findings herein the two stipulations of fact filed by the parties. The following is a summary of those stipulated facts so far as germane to *229 the unresolved issues in this case, together with additional facts found from evidence adduced at the hearing. Petitioner is a Michigan corporation, with its principal place of business in Ferndale, Michigan, a city adjacent to the City of Detroit. Its tax returns for the periods here involved were filed with the collector of internal revenue for the district of Michigan at Detroit. Petitioner was organized on July 5, 1939. During the taxable periods here involved, it was engaged in the business of manufacturing precision airplane motor products and during these periods petitioner's president, treasurer and general manager was N. A. Woodworth. N. A. Woodworth, hereinafter referred to as Woodworth, worked as an apprentice machinist and toolmaker for about three years, after completing two years of high school. He attended and obtained a degree in mechanical engineering from Ohio Northern University, Ada, Ohio, at the age of 27. He then went to work for the Ford Motor Co. in Detroit as a toolmaker. After approximately eight months he became assistant to the chief of a new department which made small tools, such as mill cutters, special reamers, and special drills. When the United *230 States entered the first World War, he was selected to establish for the Ford Motor Co. a new department which manufactured aircraft engine parts for the Liberty aircraft engine. When he left the Ford Motor Co. on September 1, 1918, that department, of which he had been in charge, employed about 700 employees. He then went to work for the Slater Construction Co. in Pontiac, Michigan, helping to organize a small division which manufactured parts for aircraft engines, including two parts which had been serious bottlenecks in the aircraft program at that time. In the spring of 1919, Woodworth organized the Ex-Cell-O Tool and Manufacturing Co. at Detroit (hereinafter referred to as Ex-Cell-O), and he was president and general manager of that company from 1919 until the end of 1937. Ex-Cell-O manufactured special tools and precision parts for aircraft engines. His compensation there consisted of a salary plus a percentage of profits. That percentage was 10 per cent from 1923 or 1924 to 1929. In 1929, Ex-Cell-O's stock was offered to the public and Woodworth's percentage of the profits was reduced to 3 1/2 per cent, payable in the stock of the company, computed upon its book value. During 1935, 1936 and *231 1937, Woodworth's base salary was $20,000 per year and his total compensation for 1935, 1936 and 1937 was $25,572.76, $69,765.65, and $87,156.93, respectively. At that time he owned only one-half of 1 per cent of Ex-Cell-O's stock. In 1937, Ex-Cell-O's annual sales were approximately $5,000,000, and its employees numbered about 1,100 or 1,200. During these years Ex-Cell-O maintained a sales organization, headed by a vice president and an engineering department. In addition thereto, it had an executive personnel, consisting of five individuals, one of whom, as Woodworth's assistant, received as compensation from Ex-Cell-O for 1936 or 1937 from $67,000 to $69,000. During 1938 and the first part of 1939, Woodworth was not engaged in the manufacturing business. When petitioner was organized on July 5, 1939, it acquired certain machinery and other equipment which had been purchased from the receiver of the Partool Machine Co. At the time of the purchase this machinery was a year or two old. Some of this machinery and other equipment were sold during 1940 by petitioner and the gain of $19,347.09 derived therefrom was duly reported for Federal tax purposes. There is set forth in the margin *232 and made a part hereof a list of machinery which was owned by petitioner on December 31, 1940 (except for one item acquired on February 14, 1941), and on November 30, 1941. [1] This list shows the date of acquisition and the cost to petitioner on the date of acquisition and covers the machinery to which the depreciation issue in this case relates. In November 1941, petitioner was operating this machinery for manufacturing precision aircraft parts 21 1/2 hours a day, seven days a week, and by November 1941, the machinery was very much worn down. Under such excessive operation a machine so used requires repairing at the end of two years, and at the end of four years, which is the average life of this machinery, a machine has a salvage value of approximately 50 per cent of original cost and must be completely rebuilt. The average cost of rebuilding a machine is between one-fourth and one-third of its original cost. Petitioner's machinery was being operated by inexperienced operators, a fact which caused a shortening of the machinery's life; also the tolerances are so close in the manufacture of aircraft engine parts that the machinery is rendered useless more quickly than if it were devoted *233 to other uses. *234 In the beginning of petitioner's corporate existence, it manufactured machine tool accessories, parts for special machinery, pigs, and fixtures, because the Partool Machine Company had been equipped to manufacture such products. However, almost immediately after petitioner's organization, Woodworth began to give attention to starting a branch which would manufacture on a quantity basis hardened and ground parts with fine finish requirements for aircraft engines. Woodworth had had prior experience in this field and there were very few people in the country at that time who had had the experience of producing these parts on a quantity basis. Also, Woodworth personally preferred the manufacture of precision parts for aircraft engines to the manufacture of machine tool accessories, etc., and he realized that there would be an increased demand, both commercial and military, for aircraft engine parts. Within two months after petitioner started business, Woodworth solicited the Wright Aeronautical Corporation for contracts to manufacture precision parts for aircraft engines and, before the end of 1939, while petitioner still occupied the building in Detroit which formerly belonged to the *235 Partool Machine Company, petitioner had begun to manufacture parts for aircraft engines. Petitioner employed a maximum of 110 employees in 1939 and reported a loss of $11,677.49 in its income tax return for the period from July 5, 1939, to December 31, 1939. Petitioner's gross sales for that period were $32,471.49 and its gross profits from sales were $16,756.71. Its net income before officers' salaries and taxes was minus $7,877, and its earned surplus at the end of 1939 was minus $9,052. Petitioner paid Woodworth total compensation for that period of $3,800, and also paid out in salaries and wages a total of $29,166.66, the latter figure including $20,641.38 representing part of the cost of goods sold. On May 17, 1940, petitioner moved into a newly constructed building in Ferndale, Michigan. It is a one-story building covering 10,000 square feet. Its construction was supervised by Woodworth, who also determined the type of machinery to be purchased and the arrangement thereof. The construction of this war plant meant the end of job machining and the expansion of the manufacturing of aircraft engine parts. In May 1940, petitioner had only approximately 25 or 30 employees but by *236 the end of 1940, that number increased to approximately 300. Eighty-eight per cent (88%) of petitioner's employees in 1940 and 1941 had had no previous factory experience at all. In May 1940, petitioner employed only two men in addition to Woodworth, who had had any training in the supervision of personnel. By November 1941, petitioner had 8 or 10 foremen, all of whom were trained by Woodworth and petitioner's factory manager. A school for training foremen was also established by petitioner's factory manager under the direction of Woodworth, and a professional teacher was hired to do the instructing. Machine operators were taught on the job, that is, each operator taught another by a process of demonstration. Petitioner's entire sales department consisted solely of Woodworth. He first contacted prospective customers when petitioner had been in existence for only a couple of months. At that time petitioner had no personnel trained along the lines on which they were seeking business and Woodworth had to convince these prospective customers that petitioner had the right type of organization and could manufacture aircraft engine parts. All contracts had to be obtained by means of competitive *237 bidding and Woodworth determined the prices quoted by petitioner. Petitioner's customers during 1940 were Continental Motors and Wright Aeronautical Corporation. At the end of 1940, petitioner's unfiled orders from these two customers amounted to $897,000. Its gross sales for this period amounted to $592,508.03 and its gross profit from sales was $271,653.25. Sixty-five per cent of its products in 1940 went to foreign and commercial uses and 35 per cent to the Army and Navy. Its net income for 1940 before officers' salaries and taxes was $160,745, and its earned surplus at the end of 1940 was $63,836. Salaries and wages of all employees, other than Woodworth, for the calendar year 1940 amounted to $214,545.61. Woodworth was paid compensation for 1940 as follows: Salary
$12,000.00
Percentage (10%) of Operating
Profits
10,821.62
Percentage (2%) of Net Sales
11,850.16
Total
$34,671.78 This compensation was paid pursuant to a resolution passed at a meeting of petitioner's board of directors, attended by Woodworth, his wife, and V. L. Anderson, held on April 30, 1940. The resolution was offered by Woodworth's wife who moved its adoption, and it was supported by Vernard *238 L. Anderson, who was petitioner's secretary. It provided in part as follows: "RESOLVED that the compensation of N.A. Woodworth, as President and Executive Manager of this corporation, be fixed as follows: "1. The sum of Six Hundred ( $600) Dollars per month for the months of January, February, March and April, 1940. "2. The sum of One Thousand ($1,000) Dollars per month for the remaining months of the year 1940. "3. That in addition to the above salary, said N. A. Woodworth should be entitled to receive from this Corporation a bonus of ten (10%) per cent of this Corporation's operating profits before income and excess profits taxes as shown by the books of the corporation; and that such bonus should be computed retroactive to January 1, 1940; and that, in addition, said N. A. Woodworth shall be paid and shall be entitled to receive, from the corporation, a commission of two (2%) per cent of the net sales of this corporation for the year 1940, net sales being hereby defined as its gross sales less returns and allowances." Petitioner paid no dividends in 1940. By the end of 1941, petitioner's physical space devoted to the manufacture of aircraft engine parts increased to *239 approximately 75,000 square feet. This included part of a building (45,000 square feet) constructed under Woodworth's supervision, but financed and owned by the Defense Plant Corporation. This latter building when completed covered approximately 130,000 square feet; and by 1944, petitioner occupied about 200,000 square feet, including three buildings, which were built under Woodworth's supervision and owned by petitioner in addition to the one leased to petitioner by the Defense Plant Corporation. The acquisition of some of the machinery was also financed by the latter. Total defense plant facilities acquired by petitioner in 1940 and 1941 were in excess of $1,500,000 and in addition thereto petitioner acquired with its own funds facilities to the extent of two or three hundred thousand dollars. Petitioner's customers during the period from January 1, 1941, to November 30, 1941, were Continental Motors, Wright, and The Studebaker Corporation. Studebaker had placed, in the early months of 1941, a series of purchase orders totaling about $450,000 with petitioner for parts for a certain engine made by Wright. These orders were canceled in July 1941 and replaced by others totaling about *240 $920,000 for the manufacture of similar parts. The parts manufactured by petitioner are a difficult product to manufacture, being intricate in machinery and workmanship. Studebaker was very heavily dependent upon petitioner's success in fulfiling its commitments. As of November 30, 1941, petitioner's unfilled orders from its customers amounted to $3,445,000. Its gross sales for this period amounted to $2,975,737.53 and its gross profits from sales were $1,534,218.63. Its net income before officers' salaries and taxes was $825,433 and its earned surplus as of November 30, 1941, was $205,879. Salaries and wages of all employees, other than Woodworth, for this period amounted to $1,278,614.01. On November 27, 1941, petitioner's employees numbered 874. Woodworth was paid compensation for the period as follows: Salary
$11,000.00
Percentage (10%) of Operating
Profits
73,152.89
Percentage (2%) of Net Sales
59,514.75
Total
$143,667.64 This compensation was paid pursuant to the following resolution passed by petitioner's board of directors on April 21, 1941, at a meeting attended by Woodworth, his wife, and V. L. Anderson: "Upon like motion, duly made, seconded and *241 carried the salary of the President, N. A. Woodworth, for 1941 was fixed at $1,000.00 per month, together with a bonus of 10% of the corporation's operating profits before income and excess profits taxes, together with 2% of the net sales of the corporation for the year, such compensation being the same as was fixed by resolution of the Board April 30, 1940." Petitioner paid a dividend of $70,120 for this period. During the taxable years Woodworth devoted all his time to petitioner's business. He worked from 12 to 16 hours daily, all holidays, and all Sundays with the exception of 3 or 4. His duties in 1941 were greater than in 1940 due to the increase in volume of business. As petitioner's working capital requirements increased, Woodworth loaned money to it. He also made special financial arrangements on behalf of petitioner with Wright. He actively participated in the solving ofpetitioner's problems relating to production, inspection and the quality of the products manufactured, and personally contacted the engineering, metallurgical and inspection departments ofpetitioner's customers. Woodworth chose the work to be done and determined upon the quality requirements. There were *242 only four or five companies in the United States qualified to make these precision aircraft engine parts and the industry could not have supplied the country's needs without petitioner. Petitioner manufactured only a small diversification of parts. The machines used in the manufacture of these parts required highly skilled tooling and consequently less skilled employees. At the outset, that is, in the beginning of 1940, Woodworth personally performed the work of tooling the machines for making these aircraft engine parts, and he was not relieved of this duty until the end of 1941. For three years, petitioner was the only source of supply of a very complicated part for Wright. On April 21, 1942, petitioner's board of directors passed a resolution to pay Woodworth a salary of $1,000 per month for the fiscal year beginning December 1, 1941, and ending November 30, 1942, and in addition thereto to pay him a bonus of 10 per cent of the corporation's operating profits before income and excess profits taxes for the same period. Petitioner's sales in 1942 were approximately $13,000,000; in 1943, approximately $25,000,000; and in 1944, $1,800,000 to $2,000,000 per month. Petitioner's employees *243 numbered 4,045 on November 29, 1942, and 3,698 on November 28, 1943. However, on November 28, 1942, Woodworth, because of the very much larger volume of business, addressed a letter to petitioner's board of directors requesting that his total compensation for the fiscal year ended November 30, 1942, should not exceed $90,000, and on November 30, 1942, the board of directors passed an appropriate resolution which provided that Woodworth's compensation for that period should be $90,000. The shareholders, during the taxable periods here involved, numbered between 40 and 45. Petitioner had outstanding 70,120 shares of common stock with a par value of $1.00 per share. In April 1940, Woodworth held 31,000 shares; his wife, Bessie, held 24,000 shares; V. L. Anderson held 902 shares. Woodworth's stockholdings remained the same during the periods here involved, that is, approximately 44 per cent of petitioner's outstanding stock. Anderson, however, is reported as being the owner of 2.85 per cent of petitioner's stock in petitioner's 1940 and 1941 tax returns. Petitioner's board of directors during the taxable periods here involved consisted of Woodworth, his wife, and V. L. Anderson. *244 Petitioner's growth in 1940 and 1941 was due not only to the expanding defense program, but also to Woodworth's ability to handle petitioner's finances, to recruit new personnel, to his organizational ability, and to some extent, to his sales ability. Petitioner's production record was excellent; its deliveries without exception were on time and it met the requirements as to quality in exceptionally fine manner, unlike certain other subcontractors who made similar parts and who failed to fulfill their obligations fully. Opinion The Commissioner, for 1940, allowed $25,000 out of $34,671.78, and for 11 months of 1941, allowed $33,000 out of $143,667.64, claimed as deductions by petitioner because of compensation paid its president and general manager, Woodworth. The burden is upon the petitioner to show error in the Commissioner's action, and to show that the deductions were reasonable in amount, and paid for services actually rendered, under section 23 (a) (1) (A) of the Internal Revenue Code. The question presented is one of fact. We have carefully examined and considered all facts presented, but it is not necessary to discuss them at length. Some facts, *245 such as the ownership of the corporation largely by Woodworth and wife, and his loans to the corporation, the effect of the national defense program in furnishing business to the company, and the fact of no dividends paid in 1940, and a small dividend, compared with earned surplus remaining, in 1941, tend to support the determination of the Commissioner, yet, others tend strongly to bear out petitioner's contention. Woodworth in 1937, for services in general similar to those there involved, and for a company in which his stock holdings were exceedingly small, received about $87,000, and others, drawing salaries in high figures, performed services similar to those also performed by Woodworth for the petitioner. It is clear that his special training and abilities contributed very largely indeed to the success and the remarkable growth of the petitioner from a small business to one of great proportions, and producing large returns. The record is convincing that he was the motivating factor in the company, its success or failure dependent upon him. Though we do not consider that he should be given as much credit for getting customers or business as petitioner contends, nevertheless the *246 business came to the corporation and was efficiently handled because of him. Considering the above and all other facts, it is our opinion that for 1940 the petitioner's deduction of $34,671.78 should have been allowed, and that for the fiscal period from January 1, 1941, to November 30, 1941, the deduction should be allowed to the extent of $100,000. We so hold. Cohan v. Commissioner, 39 Fed. (2d) 540. On the question of allowance for depreciation: This too is a question of fact. On all the facts we hold that depreciation should be allowed on a basis of 12 per cent per year, as claimed by the petitioner. Decision will be entered under Rule 50. Footnotes
1. Machinery owned by N. A. Woodworth Company as at December 31, 1940 and as at November 30, 1941, on which a Necessity Certificate was never issued. ↩
LATHES
7- 5-39 Handy 4-Step 12inch X 5feet Cone
$ 775.56
7- 5-39 Reed Prentice B 16 X 54
1,997.00
7- 5-39 Reed Prentice B 14 X 30
1,855.40
9-14-39 So. Bend Underneath MD 811.7c 16inch
1,558.63
10- 2-39 W. & S. #4 #163094
1,107.12
10- 2-39 W. & S. #4 #304864
1,315.30
10- 31-39 W. & S. #2A #261906
4,360.50
12- 9-39 W. & S. #4
233.35
12- 8-39 W. & S. #4 Universal Turret
5,071.78
2-14-41 W. & S. Screw Machine
163.34
11-12-39 Mueller Screw Cutting 18inch X 8feet
157.56
1- 5-40 W. & S. Screw Machine
3,246.03
$21,841.57
DRILLS
7- 5-39 Cinn. Sliding Head 24inch Back Geared
316.00
7- 5-39 Henry & Wright AA
246.00
7- 5-39 Allen Single Spindle Hand Feed 7inch
196.00
7- 5-39 Henry & Wright I
463.00
11-12-39 Craftsman High Speed
18.67
11-12-39 Craftsman High Speed
14.00
11-12-39 Cinn. 21inch Upright
93.34
11-12-39 Leland & Gifford 2 Spindle
186.64
1,533.65
GRINDERS
7- 5-39 B. & S. Universal #13
879.95
7- 5-39 Heald Internal #70
963.00
7- 5-39 Reid #2 Surface
459.37
7- 5-39 Valley 10inch Pedestal
62.00
7- 5-39 Besley Disc. Grinder #5-18-R
284.00
7- 5-30 O. E. M. Drill Grinder
100.00
11-12-39 Morse #1 Tool Grinder
194.89
11-12-39 Fitchburg Bath Universal Grinder
186.68
11-12-39 Heald #75 Internal
274.76
11-12-39 Black & Decker 7inch Bench
14.00
11-12-39 Handy Baldor Emery
16.33
1-22-40 Die Grinder, Howarth
65.00
3,499.98
MILLS
7- 5-39 Cincinnati #2 MH Universal
3,127.23
11-12-39 B. & S. #3 Plain
186.68
7- 5-39 Cincinnati #97632
1,101.00
10- 9-39 Becker
2,239.72
6,654.63
MISCELLANEOUS
7- 5-39 Universal Hack Saw Machine 6 X 6
228.00
7- 5-39 Smith & Mills V-ram, crank shaper 16inch
1,066.00
7- 5-39 Gardner AA Duplex Air Comp
512.00
7- 5-39 D. C. Generator Set
144.00
7- 5-39 Reed Prentice Band Saw & Filing Machine
682.00
9-18-39 G. E. Arc Welding Transformer
145.00
11-12-39 Greenerd Arbor Press #5
46.67
11-12-39 Peerless Hack Saw
58.34
2,882.01
$36,411.84